IN THE MATTER OF THE APPLICATION OF LINCOLN LOY McCANDLESS FOR REGISTRATION OF TITLE TO LAND IN THE DISTRICT OF WAIANAE, OAHU, BEING GRANT NO. 527 TO A. BISHOP AND CALLED THE LAND OF "KALENA."

No. 2204.

ARGUED JANUARY 8, 1937.                     DECIDED MARCH 5, 1937.

COKE, C. J., BANKS, J., AND CIRCUIT JUDGE METZGER IN PLACE OF PETERS, J., DISQUALIFIED.

OPINION OF THE COURT BY BANKS, J.

The instant controversy arose out of a land court application filed by Lincoln L. McCandless on February 25, 1918, to register and confirm title in him to a certain parcel of land comprising 482 acres situate in the district of Waianae in the City and County of Honolulu, Territory of Hawaii, which is part of what is commonly known as Schofield Barracks. The original source of the applicant's title was Artemas Bishop to whom it was alleged was granted by the Kingdom of Hawaii in 1851, Royal Patent No. 527. Citation was issued on April 3, 1918, citing for appearance the following: "Territory of Hawaii to United States Army, Territory of Hawaii by I. M. Stainback, Attorney General, and Bertram G. Rivenburgh, Commissioner of Public Lands; City and County of Honolulu by Joseph J. Fern, Mayor, and President of the Board of Supervisors; and to all whom it may concern." The Territory of Hawaii filed its answer claiming that 228 acres of the land sought to be registered by the applicant belonged to the United States of America in fee simple to which the Territory of Hawaii was entitled to the use, control, management and the power of disposition in fee simple. No other appearance was made.

After a hearing on the application the land court awarded to the applicant only 254 acres of the land claimed by him and decreed that the remaining 228 acres were public lands, and therefore refused to register the same in the applicant. From that decision the applicant appealed to the circuit court sitting with a jury as prescribed by statute. The appeal remained dormant for many years when it was finally set down for trial on December 3, 1934. Shortly before the date set for trial the United States of America, by its present United States District Attorney for the district of Hawaii, I. M. Stainback, Esq., who was duly authorized by the Attorney General of the United States to appear specially, filed the following mo-

tion: "Comes now the United States of America, By I. M. Stainback, United States Attorney in and for the District of Hawaii, and appearing specially for this Motion and for no other purpose, moves this Court for an Order dismissing the petition and appeal to a jury upon the following ground: That this Court is without jurisdiction to entertain a suit against the United States or against the property of the United States or determine title to property in possession of the United States and claimed by it. This Motion is based upon the records and files herein and upon the affidavit of I. M. Stainback attached hereto and made a part hereof." After a hearing the motion was granted and it is from this decision of dismissal that the applicant has brought the case here on writ of error. This action of the lower court and the motion upon which it is predicated present the only question upon which our judgment is sought.

Upon the hearing on the motion the Territory of Hawaii, appearing by George Kimball, Deputy Attorney General, disclaimed any interest in the lands for the reason that they had been set aside for military purposes by two presidential proclamations. These two executive orders were introduced and received as evidence and are a part of this record. The first executive order, No. 1242, was issued by President William H. Taft on August 23, 1910, and the second, executive order No. 2800, was issued by President Woodrow Wilson on February 4, 1918. The second executive order covered substantially the land described in the first but was more precise in its description. It appears from the evidence that these two orders included the lands claimed by the applicant and that the area in question was, at the time the application was filed, and is now claimed by the United States government and was and is now occupied by the United States military forces.

The authority of the Presidents of the United States to

so deal with the public lands of the Territory exists by virtue of the agreement of annexation entered into between the then Republic of Hawaii and the United States of America. On February 9, 1897, a resolution was passed by the senate of the Republic of Hawaii ratifying annexation of the Republic which reads in part as follows: "Be It Resolved, by the Senate of the Republic of Hawaii: That the Senate hereby ratifies and advises and consents to the ratification by the President of the treaty between the Republic of Hawaii and the United States of America on the subject of the annexation of the Hawaiian Islands to the United States of America concluded at Washington on the 16th day of June, A. D. 1897, which treaty is word for word as follows: * * * 'Article I. The Republic of Hawaii hereby cedes absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies; and it is agreed that all the territory of and appertaining to the Republic of Hawaii is hereby annexed to the United States of America under the name of the Territory of Hawaii. Article II. The Republic of Hawaii also cedes and hereby transfers to the United States the absolute fee and ownership of all public, government or crown lands, public buildings or edifices, ports, harbors, military equipments, and all other public property of every kind and description belonging to the government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining. The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition. Provided: that all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military or naval purposes of the United States, or may be assigned for the use of the local govern-

ment, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.' "

On July 7, 1898, the Congress of the United States passed a resolution annexing the Hawaiian Islands, which reads in part as follows: "Whereas the Government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining; Therefore *Resolved by the Senate and House of Representatives of the United States of America in Congress Assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America. The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition: Provided, That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for

the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes."

In 1900 when Congress passed the Organic Act it provided in section 91 in part as follows: "That, except as otherwise provided, the public property ceded and transferred to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July seventh, eighteen hundred and ninety-eight, shall be and remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until otherwise provided for by Congress, or taken for the uses and purposes of the United States by direction of the President or of the Governor of Hawaii."

It is contended by the applicant that the proceedings which were commenced by him are not a suit to try title adverse to the United States government but merely a procedure to ascertain the boundaries of the lands covered by Royal Patent No. 527. We think that this contention evades the real question involved for it is evident that if the boundaries to Royal Patent No. 527 are so set as to include the lands claimed, possessed and occupied by the United States government the title thereto is necessarily involved.

Furthermore the proceedings were instituted in the instant case under statutory provisions specifically designed to register, confirm and establish title to land. The first sentence of the application to the land court reads: "I, the undersigned, hereby apply to have the land hereinafter described brought under the operation and provisions of chapter 154 [178] of the Revised Laws of Hawaii [1915] as amended [now R. L. 1935, ch. 144], to have my title therein registered and confirmed."

Section 3133, R. L. 1915 [R. L. 1935, § 5000], provided in part as follows: "A court is hereby established,

to be called the land court, which shall have exclusive original jurisdiction of all applications for the registration of title to land within the Territory, with power to hear and determine all questions arising upon such applications, and also have jurisdiction over such other questions as may come before it under this chapter, subject, however, to the right of appeal, as hereinafter provided. The proceedings upon such applications shall be proceedings in rem against the land, and the decrees shall operate directly on the land and vest and establish title thereto."

The citation which was issued in the instant case followed word for word, except that in brackets, the citation in section 3162, R. L. 1915 [R. L. 1935, § 5024], which was as follows: "You are hereby cited to appear at the land court to be held at * * * in the Island of * * * on the * * * day of * * * A. D. * * * at * * * o'clock in the [forenoon], to show cause, if any you have, why the prayer of the said application should not be granted. And unless you appear at said court at the time and place aforesaid your default will be recorded, and the said application will be taken as confessed, and you will be forever barred from contesting said application or any decree entered thereon."

Section 3170, R. L. 1915 [R. L. 1935, § 5037], provided in part as follows: "If the court after hearing finds that the applicant has title, as stated in his application, and proper for registration, a decree of confirmation and registration shall be entered. Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in the following section. It shall be conclusive upon and against all persons, including the Territory, whether mentioned by name in the application, notice or citation, or included in the general description 'to all whom it may concern.' " The same section provided for the registration of a possessory title. That portion read as follows: "When a possessory

title only is required, the applicant may be registered as the owner of the fee simple on giving such evidence of actual bona fide possession and of title, and serving such notices, if any, as may from time to time be ordered by the court." The proceedings in the case before us, however, were not for the purpose of establishing a mere possessory title.

Concerning the jurisdiction and power of the land court this court said in *In Re Rosenbledt,* 24 Haw. 298, 307: "Section 3133 R. L. [1915] as amended establishes a land court with exclusive jurisdiction of all applications to register title to land, makes the court a court of record with a seal and authorizes it to make and prescribe rules of practice and forms to be used in proceedings before it. Later sections authorize appeals to this court upon points of law and to the circuit courts sitting with a jury upon questions of fact. In case of appeal to the circuit court sitting with a jury the issues are to be framed in the land court within thirty days after the date of the judgment from which the appeal is taken. The owner of any estate or interest in land may apply to have his title registered. The matters which the petition shall contain, the contents of notices and the manner of giving them, as well as other matters of practice, are prescribed and the court given power to make other regulations. It is provided that any person claiming an interest, whether named in the notice or not, may appear, answer and state all objections to the application and set forth the interest of the answering party. The court is given power to make all orders and judgments, to issue writs of possession and other process and to take all other steps necessary for the promotion of justice in matters pending before it and to carry into full effect all powers which are given to it by the laws of the Territory. The court is authorized to dismiss the application of an applicant for registration of absolute title when

the court finds that he has not a proper title for registration without prejudice and may permit the applicant to amend his application before final decree. The court is, by the terms of the statute, to decree and register absolute titles which bind all of the world, including the Territory, with certain exceptions, which are subject to be reopened only on petition for review upon the ground of fraud within one year. The court is also by the terms of the statute authorized to register possessory titles binding all claims except those subsisting or capable or arising at the time of registration. Qualified titles, those subject to certain reservations, may be registered. The court may remove clouds on titles and may find and decree in whom the title to any interest, legal or equitable, in land is vested, whether in the applicant or in any other person."

Our conclusion is therefore that the proceedings in the case at bar were instituted solely for the purpose of trying and establishing the title to the lands in question.

Although the United States is not a party of record it is, aside from the applicant, the only real party in interest. The names of record are not determinative of parties suing or sued but the operation and effect of the judgment or decree which can be entered determine the parties in interest. Such is the holding in *Minnesota* v. *Hitchcock*, 185 U. S. 373, where the court said (p. 387): "The United States is, therefore, the real party affected by the judgment and against which in fact it will operate, and the officers have no pecuniary interest in the matter. If whether a suit is one against a State is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered, the same rule must apply to the United States. The question whether the United States is a party to a controversy is not determined by the merely nominal party on the record

but by the question of the effect of the judgment or decree which can be entered."

If this court were to overrule the decision of the circuit court granting the motion to dismiss and reinstate the case below the suit would be one to settle the title to the lands not only against the world in general but primarily against the United States. We are not here intimating or deciding that a decree of the land court or of the circuit court sitting with a jury or of this court in affirming the action of either of the inferior tribunals would estop the United States in any future action. We merely decide that since the title of the United States to the lands must necessarily and directly be affected by such a decree the land court proceedings constitute in substance a suit against the United States and property claimed, occupied and possessed by it.

The sole question presented therefore is whether or not when an applicant by land court proceedings seeks to establish title to lands which the United States government possesses, occupies and claims, territorial courts have jurisdiction to try the title to such lands when the United States has not consented that a suit against it or its property may be brought.

The Supreme Court of the United States has answered this question in several cases. In *Stanley* v. *Schwalby,* 162 U. S. 255, an action of trespass to try the title to a parcel of land which was part of a military reservation in San Antonio, Texas, was brought by Mary A. Schwalby and her husband against General David S. Stanley and several other army officers. The plaintiffs claimed one-third of the land in fee simple and the right of possession to the whole. The United States District Attorney, acting under instructions from the United States Attorney General, in behalf of the United States, joined with the defendants in an answer setting up among other defenses that the title to the

land was in the United States and that the individual defendants claimed no title but were merely in possession as officers and agents of the United States. After the case had been considered by both the district and supreme courts of Texas and a judgment was rendered in favor of the plaintiffs the Supreme Court of the United States reversed the judgment and remanded the case without considering the merits of the cause.

At the second trial the United States District Attorney filed an amended answer which contained two pleas in bar (p. 264) : "1st, that this was an action, nominally against the individual defendants, 'but in fact against the United States of America, a sovereign corporation not liable to suit in this court or any other, in the absence of an act of Congress;' 2d, that the action was against the property of the United States." The district court again entered judgment for the plaintiffs which was affirmed by the court of civil appeals. Application to the supreme court of Texas for a writ of error to the court of civil appeals having been denied, the defendants appealed to the Supreme Court of the United States. In affirming the judgment of the district court the court of civil appeals expressed the following opinion (pp. 268, 269) : " 'The United States were not sued, and neither was it attempted to subject the property of the United States to suit; and neither of these propositions was advanced or held by the district court. Stanley and others were sued individually as trespassers, not as officers of the United States; and the United States voluntarily made themselves parties to the suit. That this suit was properly brought has been decided in a number of cases, and has been reaffirmed in this identical case by the Supreme Court of the United States. The jurisdiction of the court is not ousted because the individuals sued assert authority to hold possession of the property as officers of the United States government. They must show sufficient

authority in law to protect them. The mere fact that individuals have been placed in possession by the government would not be a valid defence, unless the government had the lawful authority to so place them.'" The Supreme Court of the United States, however, disagreed with the Texas court and speaking on this subject said: "It is a fundamental principle of public law, affirmed by a long series of decisions of this court, and clearly recognized in its former opinion in this case, that no suit can be maintained against the United States, or against their property, in any court, without express authority of Congress. 147 U. S. 512. See also *Belknap* v. *Schild,* 161 U. S. 10. The United States, by various acts of Congress, have consented to be sued in their own courts in certain classes of cases; but they have never consented to be sued in the courts of a State in any case. Neither the Secretary of War nor the Attorney General, nor any subordinate of either, has been authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers. *Case* v. *Terrell,* 11 Wall. 199, 202; *Carr* v. *United States,* 98 U. S. 433, 438; *United States* v. *Lee,* 106 U. S. 196, 205. * * * The judgments of the courts of the State of Texas appear to have been largely based on *United States* v. *Lee,* above cited. In that case, an action of ejectment was brought in the Circuit Court of the United States against officers occupying in behalf of the United States lands used for a military station and for a national cemetery. The Attorney General filed a suggestion of these facts, and insisted that the court had no jurisdiction. The plaintiffs produced sufficient evidence of their title and possession; and the United States proved no valid title. This court held that the officers were trespassers, and liable to the action; and therefore affirmed the judgment below, which, as appears by the record of that case,

was simply a judgment that the plaintiffs recover against the individual defendants the possession of the lands described, and costs. And this court distinctly recognized that, if the title of the United States were good, it would be a justification of the defendants; that the United States could not be sued directly by original process as a defendant, except by virtue of an express act of Congress; and that the United States would not be bound or concluded by the judgment against their officers. 106 U. S. 199, 206, 222. In an action of trespass to try title, under the laws of Texas, a judgment for the plaintiff is not restricted to the possession, but may be (as it was in this case) for title also. By section 4784 of the Revised Statutes of the State, 'the method of trying title to lands, tenements or other real property shall be by action of trespass to try title.' By section 4808, 'upon the finding of the jury, or of the court where the case is tried by the court, in favor of the plaintiff for the whole or any part of the premises in controversy, the judgment shall be that the plaintiff recover of the defendant the title, or possession, or both, as the case may be, of such premises, describing them, and where he recovers the possession, that he have his writ of possession.' By section 4811, the judgment 'shall be conclusive, as to the title or right of possession established in such action, upon the party against whom it is recovered, and upon all persons claiming from, through or under such party, by title arising after the commencement of such action.' And it has been declared by the Supreme Court of the State that, by the statutory action of trespass to try title, 'it was unquestionably the legislative intention to provide a simple and effectual remedy for determining every character of conflicting titles and disputed claims to land, irrespective of the fact of its actual occupancy or mere pedal possession;' and 'a method of vesting and divesting the title to real estate, in all cases where the right

or title, or interest and possession, of land may be involved,' by partition or otherwise. * * * In the case at bar, the United States, and their officers in their behalf, claimed title in the whole land. The plaintiffs claimed title in one undivided third part only. The final decision below was against the claim of the intervenor for another third part of the land. It was thus adjudged that the United States had the title in that part, if not also in the remaining third, to which no adverse claim was made. Such being the state of the case, the final judgment in favor of the plaintiffs for the third part awarded to them, and for possession of the whole jointly with the individual defendants, was directly against the United States and against their property, and not merely against their officers." The judgment of the court of civil appeals was reversed and the case remanded to that court with instructions to dismiss the action against the United States.

When this case first went to the Supreme Court of the United States, which is reported under the same name in 147 U. S. 508, the court had occasion to express its views on this subject. It said (p. 512) : "In *The Siren,* 7 Wall. 152, 154, Mr. Justice Field, who spoke for the court, in adverting to the familiar rule of the common law that the sovereign cannot be sued in his own courts without his consent, and the ground upon which the rule rested, said : 'This doctrine of the common law is equally applicable to the supreme authority of the nation, the United States. They cannot be subjected to legal proceedings at law or in equity without their consent; and whoever institutes such proceedings must bring his case within the authority of some act of Congress. Such is the language of this court in *United States* v. *Clarke,* 8 Pet. 436, 444. The same exemption from judicial process extends to the property of the United States, and for the same reasons. As justly observed by the learned judge who tried this case, there is

no distinction between suits against the government directly, and suits against its property.' If then this suit had been directly against the United States or the property of the United States, it could not have been maintained, and it is only upon the proposition that it was brought, not against the United States, but against the officers of the United States as individuals, although holding possession of the property under their authority and as belonging to them, that it proceeded to judgment."

Mr. Justice Field who alone dissented, but on other issues, concurred with the majority on the subject under consideration in the following language (p. 521) : "I fully agree with the court that, if this action had been brought directly against the United States, it could not be sustained, for it is among the axioms of the law that the government, State or national, is not amenable to civil process at the suit of a private citizen, except upon its consent to submit to such jurisdiction. Any judgment rendered in proceedings not voluntarily assented to would necessarily be void, whether the judgment be rendered for money or specific property."

In *Louisiana* v. *Garfield,* 211 U. S. 70, a bill was brought in the United States Supreme Court to establish the title of the State of Louisiana to swamp lands and to enjoin the Secretary of the Interior and other officers from disposing of the lands. By an Act in 1849 Congress purported to grant all of the swamp lands in Louisiana to the State and provided that a list of such lands be submitted to the Secretary of the Treasury (the jurisdiction of these lands was afterwards placed in the Secretary of Interior) and upon his approval such lands would vest in the State. The lands in dispute were used as a military reservation and although they were included in the lands submitted to the Secretary of the Treasury, were not approved. In 1871 the military reservation was abandoned in pursuance to an

Act of Congress of the same year which authorized the
Secretary of War to transfer the lands to the Secretary of
the Interior to be sold. In 1895 the Secretary of the Interior
decided that upon the abandonment of the military reser-
vation the lands came under the operation of the grant of
1849 and he thereupon "approved" the lands to the State
of Louisiana. The State contended that upon this approval
the title to the lands passed to it. The defendants demurred
to the bill on several grounds, one of which was "that this
really is a suit against the United States, which has not
consented to be sued." The court held that the approval
of the lands to the State was made upon a mistake of law
and therefore was void on its face. A doubt arose, however,
because of the statute which limited suits by the United
States to vacate patents to five years. It was in relation
to this question that the court decided that the United
States was a necessary party and therefore dismissed the
bill on the ground that it had no jurisdiction, saying (p.
77) : "The doubt is whether Louisiana has not now a good
title by the lapse of five years since the approval and by
the operation of that act. But that doubt cannot be re-
solved in this case. It raises questions of law and of fact
upon which the United States would have to be heard. The
United States fairly might argue that the statute of limi-
tations was confined to patents, or was excluded by the
act of 1871. If it yielded those points it still reasonably
might maintain that a title could not be acquired under
the statute by a mere void approval on paper, if the United
States ever since had been in possession claiming title, as
it claimed it earlier by the act of 1871. It might argue that,
for equitable relief on the ground of title in the plaintiff,
in the teeth of the last named act, it would be necessary at
least to allege that the State took and has held possession
under the void grant. The United States might and un-
doubtedly would deny the fact of such possession, and that

fact cannot be tried behind its back. It follows that the United States is a necessary party and that we have no jurisdiction of this suit."

In *New Mexico* v. *Lane,* 243 U. S. 52, it appears that in 1898 Congress granted to the Territory of New Mexico certain lands for the support of common schools. It was also provided that if any of these lands should be mineral, other lands would be granted in lieu thereof. In 1911 coal was found in one of these parcels of land for which an application to purchase was made by an individual. Protests were filed against the application and the Territory of New Mexico intervened, claiming that the land was not known coal land at the time of the grant in 1898. The commissioner of the general land office had the authority to investigate that fact but he exceeded that authority by undertaking to determine the true character of the land as of the date of the hearing. The result of the hearing was in favor of the prospective purchaser and the local officers were directed to issue a final certificate to him. It was to avert this action that a bill was brought to enjoin the Secretary of the Interior and the commissioner of the general land office from issuing a certificate. Among other things the bill prayed for a decree vesting title in the Territory of New Mexico. A motion to dismiss the bill was filed setting up several grounds, the first of which was that the United States was a necessary party because it appeared that the title to the land was in the United States. In granting the motion the court said (p. 58) : "The motion should be granted on the ground that the suit is one against the United States, under the authority of *Louisiana* v. *Garfield,* 211 U. S. 70. In that case a bill was brought in this court to establish the title of the State of Louisiana to certain swamp lands which it claimed under the statutes of the United States and to enjoin the Secretary of the Interior and other officers of the Land Department

from carrying out an order making different disposition of the land. Under the statute it was contended the land vested in the State in fee simple, that is, the act was contended to have the same character and efficacy as the Act of June 21, 1898, is asserted to have in the case at bar. And certain facts were necessary to be determined as elements of decision. This court said that in the case there were questions of law and of fact upon which the United States would have to be heard. So in the present case there is a question of law whether the Act of June 21, 1898, had the quality as a grant of the land asserted of it, whether of itself or because of its terms or their prior construction and its adoption, indeed, whether there was such a prior construction or its adoption, and again of the fact of the character of the land at the time of the grant and the evidence of it and the knowledge of it." (See also *Oregon* v. *Hitchcock*, 202 U. S. 60, 69; *Naganab* v. *Hitchcock*, 202 U. S. 473, 476; *Belknap* v. *Schild*, 161 U. S. 10; *Goldberg* v. *Daniels*, 231 U. S. 218; *International Postal Supply Company* v. *Bruce*, 194 U. S. 601, 606.)

The ninth circuit court of appeals in *Electric Steel Foundry* v. *Huntley*, 32 F. (2d) 892, although not a case in which the title to land was tried, adhered to the principle so often repeated by the Supreme Court of the United States. In that case a suit to cancel and annul an income and profits tax waiver was brought by a taxpayer against the United States collector of internal revenue and his deputy. On motion the action was dismissed by the court below for the reason that the United States was a necessary party. The plaintiff appealed from the decree of dismissal and in affirming that decree the court said: "The purpose of the waiver was to extend the period of the statute of limitations for the collection of a tax by distraint or by suit, and, if the instrument has any virtue at all, it is as a contract between the taxpayer and the United

States. That such a contract cannot be annulled or canceled in a suit against officers of the United States to which the United States is not a party would seem too plain to admit of discussion. No doubt the government is not a necessary party to a suit against an officer to compel him to perform ministerial duties enjoined by law, to restrain him from acting illegally or without authority of law, or in an action of trespass or for a tort. But this is not such a case. In the cases to which we have referred the judgment in no wise impairs the rights of the United States and does not affect it in its property or property rights, while here the decree will have the contrary effect if it be given any effect at all. The distinction between the two classes of cases is clearly pointed out in Sanders v. Saxton, 182 N. Y. 477, 75 N. E. 529, 1 L. R. A. (N. S.) 727, 108 Am. St. Rep. 826. There a landowner brought an action against the commissioners of the land office of the state of New York and the comptroller of the state to have certain deeds executed by the comptroller to the people of the state for unpaid taxes adjudged illegal and void. In reversing a decree in favor of the landowner, the Court of Appeals said: 'The action is both in effect and in form to cancel and remove the deeds to the people of the state of New York as clouds upon the plaintiff's title. The grantee in such a deed is plainly a necessary party to such an action, as it is the title of that grantee that is to be passed upon, and it cannot be adjudged void unless he is brought in court. No one would ordinarily think of disputing this proposition. The only reason for omitting to make the state a party in this case is that it cannot be made a party, and for that reason it is sought to avoid the immunity that the state possesses by making its officers parties in its stead. But it is also settled by the decisions of the Supreme Court that "the United States are not bound by a judgment to which they are not parties, and that no officer of the

government can, by defending a suit against private persons, conclude the United States by the judgment." Carr v. United States, 98 U. S. 433, 25 L. Ed. 209; United States v. Lee [106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171], supra. Now, as the only object and purpose of a suit in equity to remove a cloud on the title to property is to have any adverse title that may be asserted under such cloud passed on and adjudged void, so that the plaintiff in possession may be forever afterwards free from any danger of the hostile claim, it would seem plain that, where the judgment in an action cannot conclude or bind a party claiming under the adverse title, the action must fail.' To the same effect, see Oregon v. Hitchcock, 202 U. S. 60, 26 S. Ct. 568, 50 L. Ed. 935; Louisiana v. Garfield, 211 U. S. 70, 29 S. Ct. 31, 53 L. Ed. 92; Goldberg v. Daniels, 231 U. S. 218, 34 S. Ct. 84, 58 L. Ed. 191; Wells v. Roper, 246 U. S. 335, 38 S. Ct. 317, 62 L. Ed. 755. So here the only object and purpose of the suit was to destroy the waiver so that it could not be set up by the United States in opposition to a claim by the taxpayer that the right to collect the tax was barred by the statute of limitations. But a decree of the court in a suit against officers of the United States would not and could not deprive the government of the right to plead the waiver or destroy its legal effect; and this much was conceded by the appellant on the argument before this court. Such being the case, a court of equity will not enter a decree that binds no one and determines nothing."

This court has also announced the same rule. In *Bush v. Ter. of Hawaii*, 13 Haw. 1, the Territory was directly sued in an action of ejectment to recover possession of land and the sole question was whether such a suit could be maintained against the government. Answering this question in the negative the court said: "It is conceded that the government may be sued only in so far as it consents, but

it is contended that actions of ejectment may be maintained against it under Section 1 of the Act of March 16, 1895, (as now amended by the Organic Act) which gives the Supreme Court jurisdiction of 'all claims against the Government founded upon any statute of the Territory; or upon any regulation of an Executive Department; or upon any contract, expressed or implied, with the Government, and all claims which may be referred to it by either House of the Legislature.' The only clause relied upon in this provision of the statute is the first—relating to claims founded upon a statute, and the only statute referred to as one upon which the claim might be founded is that under which actions of ejectment are brought. But clearly a statute under which an action may be brought is not a statute upon which a claim is founded. Claims against the government may be founded upon statutes which provide for the payment of salaries, pensions, subsidies, bonds, etc., but not upon a statute which merely provides to some extent what course of procedure may be pursued in ordinary actions of ejectment. It is further contended that actions of ejectment lay against the government under the former statute (Ch. 51, Laws of 1888), and that in repealing that statute in so far as it related to actions against the Government, and enacting the new statute above referred to, the Legislature intended, not to limit the classes of actions that might be brought against the Government, but merely to prescribe a condition of loyalty on the part of the claimant; and that this is shown by the requirement in Section 6 of an allegation that the claimant, if a citizen, has at all times borne true allegiance to this Government, etc., and by the circumstances arising out of the overthrow of the monarchy and the establishment of the Provisional Government in 1893. As we understand it, the change was made, not in view of the events of 1893, but in view of the insurrection of 1895 and of the decisions of the court in

*High* v. *Hawaiian Government,* 8 Haw. 546, and *Dilling-ham* v. *Hawaiian Government,* 9 Ib. 101, that under the former statute the Government was liable in actions of tort. The statute was radically changed and for the very purpose of limiting actions against the Government to those *ex contractu.* The statute now in force was taken substantially from that of the United States relating to the court of claims. In *Langford* v. *United States,* 101 U. S. 341, the Supreme Court of the United States held that the statute limited the jurisdiction of the Court of Claims to cases *ex contractu,* and that an action would not lie against the United States for the use and occupation of land which the Government claimed as its own, whatever might be the rule in case the Government had taken the land for public use recognizing its private ownership in others. *United States* v. *Lee,* 106 Ib. 196, relied on for the Territory, was not brought in the Court of Claims under the statute from which ours is taken. It was an ordinary action of ejectment brought originally in a state court by a private person against other persons in their private capacity and was subsequently removed into a Circuit Court of the United States, where the Attorney-General appeared specially and set up the claim of the United States. It was agreed that the action could not have been maintained against the United States, not upon the particular ground that ejectment did not come within the terms of the statute, for it was clear that the statute had no application to that case, but upon the general ground that the Government could not be sued without its consent, and the question was whether ejectment could be maintained against the individual defendants when they claimed to hold only on behalf of the Government. A bare majority of the court held that it could under the circumstances of that case. But, as already stated, it was taken for granted that ejectment would not lie against the Government itself,

and the minority of the court, referring to the statute relating to the Court of Claims from which ours is taken, said (p. 240), 'No act of Congress has conferred upon that court, or upon any other tribunal, general jurisdiction of suits against the United States to recover possession of real property, or to redress a tort.' "

In *Polyblank v. Kawananakoa,* 17 Haw. 82, a bill to foreclose a mortgage was brought by the mortgagee against the mortgagors. At a time subsequent to the execution of the mortgage the mortgagors conveyed a part of the mortgaged premises to one Damon and Damon in turn conveyed it to the Territory. The bill originally made the Territory a party to the suit but upon demurrer by the Territory the plaintiffs dismissed their bill as to it. The decree in the court below provided for a deficiency judgment against the mortgagors if the sale of the mortgaged premises should prove insufficient to pay the amount due. On appeal to this court the mortgagors contended that a deficiency judgment should not have been entered against them unless all of the mortgaged land was sold. In affirming the decree of the court below this court said (p. 83) : "All that the mortgagors can claim is that the mortgagee should foreclose on and have sold all of the mortgaged property that is possible, that is, that she should foreclose all that the law allows her to foreclose, before entering up a deficiency judgment. In this case all of the mortgaged property is to be sold except that part which is now held by the Territory. The interest of the Territory in that portion cannot be foreclosed and sold without joining the Territory as a party defendant, and that cannot be done."

Being dissatisfied with the view taken by this court the mortgagors appealed to the Supreme Court of the United States, *Kawananakoa v. Polyblank,* 205 U. S. 349. The same contention was made before that tribunal but without success. Speaking through Mr. Justice Holmes it said

(p. 352) : "The appellants contend that the owners of the equity of redemption in all parts of the mortgage land must be joined, and that no deficiency judgment should be entered until all the mortgaged premises have been sold. In aid of their contention they argue that the Territory of Hawaii is liable to suit like a municipal corporation, irrespective of the permission given by its statutes, which does not extend to this case. They liken the Territory to the District of Columbia, *Metropolitan R. R. Co.* v. *District of Columbia,* 132 U. S. 1, and point out that it has been a party to suits that have been before this court. *Damon* v. *Hawaii,* 194 U. S. 154; *Carter* v. *Hawaii,* 200 U. S. 255. The Territory, of course, could waive its exemption, *Smith* v. *Reeves,* 178 U. S. 436, and it took no objection to the proceedings in the cases cited if it could have done so. See Act of April 30, 1900, c. 339, § 96; 31 Stat. 141, 160. But in the case at bar it did object, and the question raised is whether the plaintiffs were bound to yield. Some doubts have been expressed as to the source of the immunity of a sovereign power from suit without its own permission, but the answer has been public property since before the days of Hobbes. (Leviathan, c. 26, 2.) A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends. 'Car on peut bien recevoir loy d'autruy, mais il est impossible par nature de se donner loy.' Bodin, Republique, 1, c. 8. Ed. 1629, p. 132. Sir John Eliot, De Jure Maiestatis, c. 3. Nemo suo statuto ligatur necessitative. Baldus., De Leg. et Const., Digna Vox (2d ed., 1496, fol. 51b. Ed. 1539, fol. 61). As the ground is thus logical and practical, the doctrine is not confined to powers that are sovereign in the full sense of juridical theory, but naturally is extended to those that in actual administration originate and change at their will

the law of contract and property, from which persons within the jurisdiction derive their rights. A suit presupposes that the defendants are subject to the law invoked. Of course it cannot be maintained unless they are so. But that is not the case with a territory of the United States, because the Territory itself is the fountain from which rights ordinarily flow."

*United States* v. *Lee,* 106 U. S. 196, is relied upon by the appellant as decisive of the instant case. The *Lee* case, however, is easily distinguishable from the cases above referred to and the one at bar. In that case one Lee brought an action of ejectment against Kaufman and Strong, United States army officers, to recover possession of the Arlington estate. The property was used by the United States as a national cemetery and a military station. The Attorney General of the United States appeared specially and suggested to the court that the property belonged to the United States and that the individual defendants held it merely as agents without any personal interest therein and that their possession was held under the authority of the government. The action was originally commenced in a state court of Virginia and subsequently removed to the circuit court of the United States where judgment was entered for the plaintiff. That judgment was against the defendants individually, dispossessing them of the land. This was the judgment which was affirmed by the Supreme Court of the United States. That the action was essentially one of trespass against the military officers is indicated by the Supreme Court of the United States itself in the following language (pp. 210, 215, 216) : "The case before us is a suit against Strong and Kaufman as individuals, to recover possession of property. The suggestion was made that it was the property of the United States, and that the court, without inquiring into the truth of this suggestion, should proceed no further; and in this case, as in that, [United

States v. Peters, 5 Cranch 115] after a judicial inquiry had made it clear that the property belonged to plaintiff and not to the United States, we are still asked to forbid the court below to proceed further, and to reverse and set aside what it has done, and thus refuse to perform the duty of deciding suits properly brought before us by citizens of the United States. * * * This examination of the cases in this court establishes clearly this result: that the proposition that when an individual is sued in regard to property which he holds as officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it, and that in many others where the record shows that the case as tried below actually and clearly presented that defence, it was neither urged by counsel nor considered by the court here, though, if it had been a good defence, it would have avoided the necessity of a long inquiry into plaintiff's title and of other perplexing questions, and have quickly disposed of the case. And we see no escape from the conclusion that during all this period the court has held the principle to be unsound, and in the class of cases like the present, represented by *Wilcox* v. *Jackson, Brown* v. *Huger,* and *Grisar* v. *McDowell,* it was not thought necessary to re-examine a proposition so often and so clearly overruled in previous well-considered decisions."

A similar view of the *Lee* case was taken in *In Re Ayers,* 123 U. S. 443, and *Cunningham* v. *Macon & Brunswick R. R. Co.,* 109 U. S. 446. In the *Ayers* case the court said (pp. 501, 502) : "The legislation under which the defendant justified being declared to be null and void as contrary to the Constitution of the United States, therefore left him defenceless, subject to answer to the consequences of his personal act in the seizure and detention of the plaintiff's property, and responsible for the damages occasioned

thereby. This principle is illustrated and enforced by the case of *United States* v. *Lee*, 106 U. S. 196. In that case the plaintiffs had been wrongfully dispossessed of their real estate by defendants, claiming to act under the authority of the United States. That authority could exist only as it was conferred by law, and as they were unable to show any lawful authority under the United States, it was held that there was nothing to prevent the judgment of the court against them as individuals, for their individual wrong and trespass. This feature will be found, on an examination, to characterize every case where persons have been made defendants for acts done or threatened by them as officers of the government, either of a State or of the United States, where the objection has been interposed that the State was the real defendant, and has been overruled. The action has been sustained only in those instances where the act complained of, considered apart from the official authority alleged as its justification, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrongdoer in his individual character."

Mr. Justice Miller, the author of the majority opinion in the *Lee* case in considering the principle that the sovereign is exempt from suit, made a classification in the *Cunningham* case of cases in which actions were maintainable and referred particularly to the *Lee* case. Speaking for the majority of the court in the *Cunningham* case he said (pp. 451-453) : "It may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution. This principle is

conceded in all the cases, and whenever it can be clearly seen that the State is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction. But in the desire to do that justice, which in many cases the courts can see will be defeated by an unwarranted extension of this principle, they have in some instances gone a long way in holding the State not to be a necessary party, though some interest of hers may be more or less affected by the decision. In many of these cases the action of the court has been based upon principles whose soundness cannot be disputed. A reference to a few of them may enlighten us in regard to the case now under consideration. 1. It has been held in a class of cases where property of the State, or property in which the State has an interest, comes before the court and under its control in the regular course of judicial administration, without being forcibly taken from the possession of the government, the court will proceed to discharge its duty in regard to that property. And the State, if it choose to come in as plaintiff, as in prize cases, or to intervene in other cases when she may have a lien or other claim on the property, will be permitted to do so, but subject to the rule that her rights will receive the same consideration as any other party interested in the matter, and be subjected in like manner to the judgment of the court. Of this class are the cases of *The Siren,* 7 Wall. 152, 157; *The Davis,* 10 Wall. 15, 20; and *Clark* v. *Barnard* and others, 108 U. S. 2. Another class of cases is where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government. In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence

he must show that his authority was sufficient in law to protect him. See *Mitchell* v. *Harmony,* 13 How. 115; *Bates* v. *Clark,* 95 U. S. 204; *Meigs* v. *McClung,* 9 Cranch, 11; *Wilcox* v. *Jackson,* 13 Pet. 498; *Brown* v. *Huger,* 21 How. 305; *Grisar* v. *McDowell,* 6 Wall. 363. To this class belongs also the recent case of *United States* v. *Lee,* 106 U. S. 196, for the action of ejectment in that case is, in its essential character, an action of trespass, with the power in the court to restore the possession to the plaintiff as part of the judgment. And the defendants, Strong and Kaufman, being sued individually as trespassers, set up their authority as officers of the United States, which this court held to be unlawful, and therefore insufficient as a defence. The judgment in that case did not conclude the United States, as the opinion carefully stated, but held the officers liable as unauthorized trespassers, and turned them out of their unlawful possession. 3. A third class, which has given rise to more controversy, is where the law has imposed upon an officer of the government a well defined duty in regard to a specific matter, not affecting the general powers or functions of the government, but in the performance of which one or more individuals have a distinct interest capable of enforcement by judicial process. Of this class are writs of mandamus to public officers, as in *Marbury* v. *Madison,* 1 Cranch, 137; *Kendall* v. *Stokes,* 3 How. 87; *United States* v. *Schurtz,* 102 U. S. 378; *United States* v. *Boutwell,* 17 Wall. 604. But in all such cases, from the nature of the remedy by mandamus, the duty to be performed must be merely ministerial, and must involve no element of discretion to be exercised by the officer." (See also the discussion of the *Lee* case above quoted in *Stanley* v. *Schwalby, supra,* and *Bush* v. *Territory, supra.* See also *Tindal* v. *Wesley,* 167 U. S. 204, 213-218.)

It is evident to us therefore that the *Lee* case, being essentially a possessory action, has no application to the

case at bar where title to land is sought to be registered, confirmed and established. Since neither the United States nor its property may be subjected to suit, the instant proceeding, being one in which the title to property occupied, possessed and claimed by the United States is necessarily involved and directly at issue, cannot be maintained.

For the foregoing reasons the decision of the trial court dismissing the cause is affirmed.

*C. H. Tracy* (also on the briefs) for applicant.

*G. P. Kimball,* Deputy Attorney General (*W. B. Pittman,* Attorney General, with him on the brief), for respondent.

*I. M. Stainback,* United States Attorney (also on the briefs), for the United States.

*C. D. Pratt* (*Stanley, Vitousek, Pratt & Winn* on the brief) *amicus curiae.*